The Phœnix Insurance Company *against* PRATT and CLARKSON.

Philadelphia,
Thursday,
January 11.

IN ERROR.

If the general agent of neutral cargo covers belligerent property in the same vessel, though without the consent or knowledge of his principal, the property of his principal is liable to condemnation, notwithstanding it is plainly distinguished from the covered property by bills of lading and invoices on board; and the underwriters on that property, if warranted neutral, are discharged, either upon the ground that the warranty has not been performed, or that the risk has been increased by the agent of the assured.

THIS was an action of covenant, brought by the defendants in error in the Common Pleas of *Philadelphia county,* upon a valued policy of insurance dated the 25th of *May* 1805, upon goods on board the ship *Charles, Richard Stites,* master, at and from *Havanna* to the island of *St. Thomas;* 7000 dollars at seven and a half per cent. The policy contained a warranty that the vessel and *goods* were *American* property, to be so proved in *Philadelphia* only; and the declaration averred the loss to be by capture by the *British*

No advantage can be taken, by bill of exceptions, of an erroneous opinion on a point of law, immaterial to the issue; but the plaintiff in error may assign error in an opinion on any point material to the issue appearing on the bill of exceptions, although it was not particularized in stating the exceptions below.

brigantine of war *L'Epervier*, by whom the *Charles* was carried into *Tortola*, where vessel and cargo were libelled and condemned as prize.

The cause came before this court upon a bill of exceptions to the charge below, in which the whole evidence on both sides was set out, together with the opinion of the court at large.

The ship *Charles* belonged on the 6th *October* 1804 to *Richard Stites*, the master, a native *American*, who on that day in consideration of 800 dollars, made a bill of sale of two thirds of her to *Pratt* and *Clarkson*, the plaintiffs, also native *Americans;* and he afterwards made to them a bill of sale of the remaining third, which was intended as a security for 366 dollars due by him to *Clarkson*, and 869 dollars due to *Pratt.** The ship sailed from *Philadelphia* on the 12th *November* 1804 bound to *St. Kitts*, with a cargo, invoiced at 5786 dollars and eighteen cents, consisting of beef, pork, corn meal, shooks, hoops, shingles and staves, the whole of which belonged to the plaintiffs; and it was consigned to *Stites* the master, and *Isaac Thomas* a young man on board, as joint supercargoes, with instructions to proceed in the first place to *St. Kitts*, and there to sell the cargo; but if sales of the whole could not be effected, then to proceed to *St. Thomas*, and sell the remainder of the cargo together with the ship; and if that could not be done, to go elsewhere; with very full powers both as to the sale and purchase of cargo, and to the forming of plans for the lucrative employment of the ship. The *Charles* arrived at *St. Kitts* about the 22d *December* 1804, where almost all the outward cargo was sold excepting twenty-five barrels of beef and the shooks, and produced exclusive of freight and charges, 5831 dollars eighty-five cents, of which a small part was sent home in molasses, a part was left in the hands of a merchant to be remitted, and 4716 dollars and forty-nine cents was invested in eighty puncheons of rum: about 750 pounds currency was paid to the supercargoes in cash. With this cargo the vessel proceeded to *St. Thomas*, where she arrived in *February* 1805.

---

* The ship had probably been repaired in the mean time, so as to increase her value.

The rum and beef were there sold, and an invoice of dry goods, wine, &c. to the amount of 5225 dollars fifty cents was purchased with the proceeds, and shipped in the *Charles* for *Havanna*, in the name and for the account and risk of the plaintiffs. At the same time, *Stites took on board in his own name an invoice of dry goods, and* 670 *doubloons, worth* 11300 *dollars*, and then proceeded to the *Havanna*. The invoice of the plaintiffs there netted 5478 dollars, which was invested in 150 boxes white and brown sugars; and the invoice and gold of captain *Stites* netted 17623 dollars, which was invested in 350 boxes of sugars, and 27 bales of beeswax. The former were invoiced and shipped on board the *Charles* in the name and *for the account and risk of Pratt and Clarkson;* and *Stites* signed bills of lading *in their name* deliverable to himself at *St. Thomas.* The latter were invoiced and shipped *in the name of Stites, and for his sole account and risk.* To the plaintiffs' bill of lading was annexed an affidavit of *Hernandez*, of the house of the widow *Poey* and *Hernandez*, who made all the sales and purchases of the cargo, that the property was for the sole account and risk of the plaintiffs, and that no citizen or subject of any of the belligerent powers had any interest therein. To the bill of lading of *Stites*, an affidavit by himself was annexed to the same effect. The *Charles* sailed with this cargo for *St. Thomas* on the 12th of *April*, and was captured on the 9th of *May* by the brigantine *L'Epervier*, and carried into *Tortola*. On the 11th *May*, *Stites* wrote to the plaintiffs that there was no doubt the vessel and cargo would be condemned, and recommended an abandonment, which was accordingly made on the 8th of *June*. On the 3d *June* the judge of vice-admiralty pronounced the vessel and cargo to have belonged at the time of capture to enemies of the crown of *Great Britain*, and as such or otherwise liable to condemnation, and condemned the same accordingly as good and lawful prize.

By the proceedings in the vice-admiralty, which were given in evidence by the plaintiffs, it appeared that the captain in answer to the standing interrogatories, swore that the plaintiffs were laders of all the cargo that was put on board at *Philadelphia*, and owners of the greatest part; and that he owned the rest. That they owned 150 boxes sugar at the

time of the capture, and that all the rest of the lading belonged to him. That he knew the lading so belonged, from its being the returns of the cargo carried out, *of which a part, to the amount of seven or eight thousand dollars, was sold at St. Kitts, and the rest, to the value of about six thousand dollars, was sold at St. Thomas; that of this, part was carried down to the Havanna in goods, and part in* 670 *doubloons, added to which,* he received about eight or nine thousand dollars at St. Thomas for nankeens he sold there, which were his own property, and which came to him there in the schooner Intrepid; and that if restored, it would belong as aforesaid, and to none others. In his claim he also mentioned *two thousand dollars which he took with him from St. Kitts,* and which he did not recollect upon his examination.

No other explanation was given of the source from which the property claimed by *Stites* proceeded, except his own account in the preceding answers. At the same time, in the correspondence with the plaintiffs, which was principally carried on by *Stites* alone, he repeatedly requested them not to let *his poor wife and children want* in his absence. It did not appear whether *Thomas* the assistant supercargo had participated in the shipment of this property, and in one or two of his private letters, he complained that *Stites* kept him in the dark as to the business of the cargo, and seemed to wish him out of the way. But to shew clearly that the account given by *Stites* was false, the defendants produced the captain of the schooner *Intrepid*, who swore that he was at *St. Thomas'* in that schooner in the winter of 1805 while *Stites* was there, that he had on board *but* 3000 *pieces of nankeen, no part of which belonged to Stites,* and that in the two or three voyages he had previously made to that island in the *Intrepid,* he did not carry any nankeens.

The defendants' counsel thereupon insisted, that the matters given in evidence were sufficient and ought to be admitted and allowed as decisive evidence to entitle the defendants to a verdict in their favour. But the court delivered the following opinion to the jury.

" "This is an action brought by *Pratt* and *Clarkson* against
" the Phœnix Insurance Company, to recover 7000 dollars
" insured on goods on board the ship *Charles* from *Havanna*
" to *St. Thomas.* The policy is a valued one; and the plain-

" tiffs therein stipulate that the property insured is *American*.
" It is in proof that the property insured at the *Havanna*
" belonged to the plaintiffs, who are *Americans;* that the in-
" surance was effected at 7 and a half per cent., and that both
" vessel and cargo have been taken, and condemned by a
" *British* court of vice-admiralty at *Tortola.* Two thirds of
" the vessel were owned by the plaintiffs, and one third by
" *Richard Stites* the captain. She sailed the 12th *November*
" 1804 from *Philadelphia* to *St. Kitts*, from *St. Kitts* to *St.*
" *Thomas*, from *St. Thomas* to the *Havanna*, and on her
" way back to *St. Thomas* she was captured by a *British*
" vessel of war on the 9th *May* 1805, and condemned a few
" days after. The reasons assigned for the condemnation of
" ship and cargo, are singular in the mode of expression. If
" captain *Stites* actually *covered* the property of the enemy
" of *Britain*, the true reason of condemnation is not assign-
" ed in the sentence of the judge. Both vessel and cargo are
" condemned as belonging to the enemies of *Great Britain*,
" and as such or otherwise liable to confiscation. From the
" mass of papers that have been read, there is not any evi-
" dence to support the decree, *with respect to the property of*
" *the plaintiffs*, and the counsel for the defendants have wisely
" taken another ground to justify the decree of the admiralty
" court at *Tortola.*"

" The extensive commerce and immense naval force of
" *Great Britain*, have given her a commanding influence over
" the maritime laws of *Europe* for above half a century. But
" it is not in superior power we are to expect moderation,
" and at all times a due respect for the rights of others."

" In the discussion of this cause a wide and extensive
" range has been taken; more so than perhaps was
" necessary. If the 150 boxes of sugar, the undisputed pro-
" perty of the plaintiffs, have been legally condemned, they
" have no right to recover, and the underwriters are dis-
" charged from their contract. On the other hand, if they
" have been condemned contrary to the laws of nations, the
" insured have a right to recover.

" Whether captain *Stites covered* the property of a belli-
" gerent, is a question of fact enveloped in some obscurity.
" The bills of lading and invoices at the *Havanna* are ap-
" parently fair and regular, and carry on the face of them no

" evidence of the charge. The sudden accumulation of pro-
" perty, is the principal circumstance rested on by the defen-
" dants to shew, that *Stites* was, at the time of the capture,
" covering the goods of a belligerent. It is certain he had
" during the voyage become possessed of a large sum of
" money, and hence the presumption, that it was the property
" of an enemy, is urged by the defendants. That the captain
" had acquired possession of property to the amount of 350
" boxes of sugar, and 27 bales of beeswax, cannot be con-
" troverted. *But whether it was belligerent or neutral pro-*
" *perty is very doubtful, and has not been proved.* When he
" sailed from *Philadelphia* there is no evidence that he car-
" ried any money; but there is every reason to believe he
" did; because he had just sold his share in two thirds of the
" ship, and mortgaged the other third, the whole amount
" being 1166 dollars.* He swears too, that he carried from
" *St. Thomas* to the *Havanna* 670 doubloons. Who owned
" this sum, from what source it was derived, whether from a
" neutral, or an enemy of *Great Britain*, is a point on which
" much observation has been expended, but nothing satis-
" factorily established.

" It is an acknowledged principle, that the captain, generally
" speaking, is the representative of the owner, and that in
" many instances the owner is responsible for his acts. In a
" voluntary deviation, in case of trespass committed by him,
" and in case of illicit trade, this is the consequence. The
" acts of the captain in these cases, are in their nature in-
" divisible, and their operation cannot be restricted to a por-
" tion of the property committed to his trust, but must ne-
" cessarily extend to the whole. But the case before us is not
" of this sort. Here the owners and the property are clearly
" distinguishable; and the ship was not engaged in the viola-
" tion of the laws of nations, or of any treaty.

" The commerce of a neutral with an enemy, except in
" contraband goods, is certainly lawful. The ship *Charles*
" therefore, being neutral property, owned by *American*
" citizens, was not illegally employed between the *Havanna*
" and the island of *St. Thomas*. They had a right to carry

* The two thirds were sold for 800 dollars, and the sale of the remain-
ing third was as security for debts to the amount of 1235 dollars.

1810.

PHOENIX
INS. CO.
*v.*
PRATT.

" sugar and beeswax from the former to the latter place. No
" law of nations forbids it. Being a neutral vessel, and liable
" to be searched, the belligerent had a right to take enemy's
" property found on board, but nothing more. If they found
" property, which in fact belonged to the enemy of *England*,
" covered by captain *Stites*, it is admitted they had a right to
" take it; but it is not admitted they had a right to seize
" and condemn property, which it is acknowledged on all
" hands belonged to a friend. When I say this, I allude to
" the 150 boxes of sugar, the property of *Pratt* and *Clarkson*,
" and which certainly did not belong to the enemies of
" *Great Britain*. The general law of nations cannot be alter-
" ed by the arbitrary ordinances of a single nation. Even the
" courts of *England* admit, that the concurrence of all nations
" is required, to produce a change in the law of nations. *The*
" *law of nations appears to be, that neither ship nor lawful*
" *goods are liable to be condemned by means of unlawful ones,*
" *unless when they belong to the same owner, or cannot be*
" *distinguished*, which is acknowledged not to be the case on
" this trial. The insured in the case before the court,
" have warranted against seizure on account of any illicit
" or prohibited trade, which must mean trade prohibited by
" treaties, or the law of nations, not the ordinances of a par-
" ticular nation. It is true the risk of the insurers cannot be in-
" creased by the insured; but that is not the case here, *because*
" *by the law of nations the risk of the underwriters is not in-*
" *creased with respect to the property of the plaintiff, by cap-*
" *tain Stites taking on board goods belonging to a belligerent.*
" Every thing usual and agreeable to the law of nations is
" supposed to be contemplated by both parties at the time of
" the insurance."

    " Upon the whole, gentlemen, if you are satisfied that
" captain *Stites* had on board *Spanish* property, and that
" *Pratt* and *Clarkson participated in the act*, your verdict
" should be for the defendants. But if you are of opinion that
" the captain had *Spanish* property on board, but that *Pratt*
" and *Clarkson had no knowledge of the fact*, your verdict
" should be for the plaintiffs."

    With this direction the cause was left to the jury, who
found a verdict for the whole sum in favour of the plaintiffs;
and the defendants' counsel tendered a bill of exceptions to

the opinion, insisting in the usual form, that " the said several
" documents, matters and proofs, were sufficient in law to *bar*
" the plaintiffs' recovery."

*Hallowell* and *Rawle* for the plaintiffs in error took three
exceptions to the charge.

1. That the proof of enemies' property being covered by
*Stites*, was so irresistible, from the sudden acquisition of so
large a sum, from his necessity at the commencement of the
voyage to mortgage one third of the ship for a small debt,
from his repeated requests to the owners not to let his poor·
wife and children want in his absence, from the falsehood of
his account of the cargo in his answers at *Tortola*, and from
the want of all possible temptation to disguise neutral pro-
perty, that the court below were wrong in saying it was
doubtful. They should ·have charged the jury that the
evidence was decisive, and that the underwriters were dis-
charged. Both vessel and cargo were warranted neutral, be-
cause a warranty of neutral goods was in this case the same as
a warranty of neutral cargo; and the excess of funds obtained
upon such a voyage, beyond ·the amount carried out, not
being explained, was, in connexion with the preceding circum-
stances, decisive evidence that the warranty was not per-
formed. *Blagge* v. *New York Insurance Company*. (*a*)

2. That the court were wrong in stating the law to be, that
neither ship nor lawful goods are liable to be condemned by
means of unlawful ones, unless when they belong to the same
owner, or cannot be distinguished; for where the goods of
an enemy are taken on board and masked by the general agent
of neutral cargo, his conduct affects the whole, notwithstand-·
ing the sound parts may be distinctly documented, and his
principal is answerable to the whole amount of his property·
on board. If a master, without the knowledge of the ship-
owner, breaks a blockade, the ship is forfeited, because the
master is the ship owner's agent; and if he is expressly con-
stituted agent of the owners of cargo, or the cargo belongs to
the owners of the ship, for the same reason the cargo is for-
feited. *The Mercurius* (*b*). The belligerent property was
here taken on board by *Stites* the general agent. It was his

(*a*) 1 *Caines* 565.           (*b*) 1 *Rob.* 71.

intention in this part of the transaction " to mislead the " British courts of justice, and the British cruizers, as to the " property of the cargo;" and upon the effect of such an intention, the opinion of Sir *William Scott* in the case of *The Eenrom* (a) is decisive, that let the interests of his employers be what they may, they must be affected by the conduct of the agent, and the consequence will attach on them, to confiscate the property so engaged. In strict law, he says, every supercargo will bind his employer; and although cases may arise where the owner will not be implicated, as where supercargoes have taken in small parcels of goods in contradiction to orders, yet where there is a deliberate interference in the war, by masking a large property of the enemy, this indulgence is not shewn, and the owners who have conferred the power upon the agent, must look to him for redress. The neutral is not at liberty to say, " I have endeavoured to protect the " whole, but this part is really my property, take the rest, and " let me go with my own." If he will engage in fraudulent concerns with other persons, *they must all stand or fall together.* The *Princessa* (b), The *Susa* (c), and The *Mars* (d) are all to the same point. In the latter case, Sir *William Scott* says, that whatever the hardship may be, the rule of law is established, that the principal is answerable for the act of his agent, not only civilly, but penally, *to the whole amount of the property under his care.* The case of *Crousillat* v. *Ball* (e) recognized the same principle. The blending of the property in one bill of lading or invoice is of no consequence. If the agent of the cargo covers property in his own name, it is the same by the law of the admiralty, as if the owner covered it in the agent's name; it is a fraud by the owner himself upon belligerent cruizers, which is punished by the condemnation of all his property. But here was in fact a confusion of property. The agent swore that 150 boxes belonged to the plaintiffs, and the residue to himself; whereas the papers on board, and the whole history of the voyage, shewed that as it respected his own part, the oath was false; and therefore as was decided in *The Rosalie and Betty* (f), the whole of his testimony was discredited, and the property of his employers

(a) 2 Rob. 7.          (c) 2 Rob. 214.          (e) 4 Dall. 294.
(b) 2 Rob. 43.          (d) 6 Rob. 87.          (f) 2 Rob. 289.

was reasonably affected by it. This is the real confusion of property. The agent resorted to a false oath to protect the enemy's interest; and this being detected, it became impossible to say what was neutral and what was not. The only question then is, was the misdirection of the court upon this point of law material to the issue? And it certainly was, for this reason. The warranty of *American* property meant, not only that the goods belonged to *Americans*, but that the owners or their agent, would do no act in the course of the voyage to compromit their neutral character; that the goods should not be liable even to impediment, in consequence of unneutral conduct. *Rich* v. *Parker* (a). Now by putting out of view the relation of agency which subsisted between *Stites* and the assured, his acts became unimportant; whereas it was by those unneutral acts, and by his false swearing, that the condemnation was justified, and that the warranty of neutrality was broken. In *Calbraith* v. *Gracie*, in the Circuit Court of the *United States*, *April* sessions 1805, the condemnation of the property being caused by the false oath of the supercargo, the court held that the warranty was broken, notwithstanding the property was most clearly *American.*

3. That the court were wrong in charging the jury that the risk was not increased by the conduct of *Stites*. It was beyond doubt increased for two reasons. First, because the masking of property to so great an extent, threw a suspicion over the whole cargo, which made it the more liable to be both taken in and condemned; and secondly, because the agent's persisting in a gross falsehood as to the bulk of the cargo, discredited his testimony as to the rest, and his being the perpetrator of the fraud, led to the entire condemnation. Without attending to the consequences which did occur, no one can believe that the company would have insured these goods for seven and a half per cent., if they had been told that two thirds of the cargo were enemies' property covered by the agent of the assured. If the law given in charge, had been founded upon the assumption that there was no covered property on board, the case might have been different; but in the conclusion, the court say, even if *Stites* did cover *Spanish* property, yet if the plaintiffs had no knowledge of

(a) 7 D. & E. 709.

it, they were entitled to a verdict. For the purpose of stating the law, they therefore admit the fact of covering, and put the case upon the knowledge, which was wholly immaterial. The true question has never been submitted to the jury, and of course we are entitled to a *venire de novo*.

*Ingersoll* and *Lewis* for the defendants in error. The bill of exceptions is bad *in toto*, because it was tendered in consequence of the court's not charging that the evidence was a bar to the plaintiffs' recovery. The form of the bill is taken from *Buller's Nisi Prius* 317, where the defendant insisted that the evidence was decisive to give him the benefit of the 24 *G.* 3. *c.* 44. which was a bar to the action, and it was therefore a question of law; whereas in this case, where evidence was given on both sides, where the foreign sentence was not conclusive, and where the fact of agency, of enemy's property, and of covering, were questions for the jury, it was impossible for the court to charge that the evidence was a bar, or that it was decisive. The bill of exceptions ought to be taken on some point of law arising upon a fact not disputed. *Show. Par. Ca.* 120. 1 *Mod. Plead.* 104, 105. *Trials per Pais* 222, 223. If a party wishes an opinion as to the sufficiency of the evidence, he must demur; *Show. Par. Ca.* 115; he cannot draw the whole matter into controversy again upon a writ of error. But further, if the bill contains matter upon which the party excepting was not overruled, it is not to be signed; *Show. Par. Ca.* 120; and as the only point upon which the plaintiffs in error were overruled, was as to the evidence being a bar, upon which they had no right to ask an opinion, we submit that the bill of exceptions falls; at least that the question in this court must be confined to that point.

It is said that the evidence was decisive, because as there was no explanation given of the excess beyond the outfit, the warranty was falsified. This was in part matter of fact for the jury. But as matter of law the premises do not warrant the conclusion. The warranty applied only to the *goods* of the assured, not to the cargo of the vessel; and the neutrality of the former was proved. The case of *Blagge* v. *The New-York Insurance Company* does not apply. There the warranty extended to the whole cargo, and the excess was obtained at a hostile port. Here the warranty was confined

to particular goods, and the excess was taken in at the neutral island of *St. Thomas.* Whether the court were right in charging that the fact of enemies' property was doubtful, is of no consequence. It was merely an opinion as to a question of fact, which is not examinable here. The admiralty proceedings, which are treated as if they were conclusive upon the matter, were not even evidence of it.

The court were not wrong in the opinion which is the ground of the second objection. That opinion is to be understood in relation to the facts. The goods of the plaintiffs were clearly distinguishable from the property in the name of *Stites;* they were personally guiltless; and *Stites* was not their agent as to the property covered; and it results from all the admiralty cases, that under such circumstances, a discrimination is made between the guilty and the innocent property. *The Mercurius* recognises this principle. The cargo is not affected by breach of blockade, unless the owners are conusant of the blockade, or the captain is the agent of the cargo. In *The Eenrom* the whole property was invoiced as belonging to the same neutral owners, who had themselves directed the masking of the property; there was therefore no means of discrimination, and the owners were personally implicated. It is there said, that if a neutral will weave a web of fraud, the admiralty will not take the trouble of picking out the threads for him, in order to distinguish the sound from the unsound. This is undoubtedly the rule. But if there is no web, if the threads are not interwoven, if the sound is already distinguished upon the papers, then it follows that the rule must be to restore. *The Rosalie* and *Betty* was also a case of mixed property; for Sir *William Scott* says in page 294, " if Mr. *Kaster* has any property in this cargo, if he " has *mixed* his interest in any proportion with the interest " of the enemy, and resorts to modes of prevarication to " conceal the enemies' interest, such a conduct will affect his " own share." It is the obscurity and doubt produced, not by the answers of the master, but by the state of the property itself, which leads to the condemnation of the whole; no means of discrimination being furnished by the documents of the property, as was required in *The Franklin* (a).

(a) 6 *Rob.* 134.

In the case of *Miller* v. *The Resolution* (*a*) the court of appeals discriminated without hesitation when means were offered. The transportation of enemies' goods is agreed to be lawful; when done fairly, the ship owner in case of capture gets full freight. *The Copenhagen* (*b*). The fraud consists in the concealment, and the penalty lies in the forfeiture of the concealed goods, and of those which are identified with them. *Lee on Captures* 141. What shews this rule decisively, is the conduct of the admiralty with respect to neutral ships in which property is masked. If the penalty extended to the whole property of the owner, whether distinguishable or not, the ship would be forfeited with the cargo; whereas the penalty in such a case is simply the loss of freight. *The Atlas* (*c*). *The Vrow Henrica* (*d*). The case of *The Rising Sun* (*e*) is in point to the present. Then as to the liability of the owners for their agent. Certainly it cannot be to a greater extent, than if they were personally implicated; and even then the discriminated property is not forfeited. But in no case are owners implicated at all by the agent's misconduct, except when he acts in relation to their property, or under a general authority. In *The Princessa* the very property claimed by an *Englishman*, was shipped by his agent as *Spanish*. *The Susa* was a ship claimed for the *American* owner, whose agents had impressed upon her the character of a *French* ship; and in *The Mars*, where Sir *William Scott* asserts the rule that the owner is answerable penally to the whole amount of the property under the agent's care, the whole property was in fact claimed by the *American* owner, and the fraud was in relation to the whole. In *Crousillat* v. *Ball* the master was the general agent of the whole cargo, and covered the enemies' property in his owner's name. *Stites* was not the agent of the plaintiffs as to the covered property, nor did he in fact act as their agent. He was joint supercargo with *Thomas*, who knew nothing of *Stites's* property. The two made one agent; neither could bind the principal without the assent of the other. His acts alone could not therefore condemn his owner's property. Nor did his con-

(*a*) 2 *Dall.* 14.        (*c*) 3 *Rob.* 245. *note a.*        (*e*) 2 *Rob.* 87.
(*b*) 2 *Rob.* 245.        (*d*) 4 *Rob.* 282.

duct at *Tortola* lead to the condemnation. False papers, prevarication, spoliation, are not a ground of condemnation, but merely causes of suspicion, grounds for further proof, or of refusing costs upon acquittal. *The Rising Sun (a)*. 2 *Brown Civ. and Adm.* 450. *Lee on Cap.* 238, 240. The fact is that the cargo and ship, the latter of which was clear *American* property and never would have been condemned on account of the covered goods, were both condemned for another cause; and that was her sailing from an enemy's colony to a port not in her own country, contrary to the spirit of the order of 24th *June* 1803. It follows therefore from the whole, that nothing was done by the agent of the assured to compromit the neutrality of the goods insured, that the warranty was performed, and that the opinion of the court was right.

As to the increase of the risk, it was a matter of fact for the jury, and the court were not asked to charge upon that point. But the risk was not increased; not the risk of being taken in, because the underwriters must have known that the vessel would be taken in if met on this voyage; nor the risk of being condemned, because condemnation followed from the voyage; and if it did not, it could not result, as has before been shewn, from covering property as *Stites* is said to have covered it. At all events the plaintiffs' agent did not increase the risk as agent, but as captain. In *Calbraith* v. *Gracie*, it was the supercargo whose acts condemned the property.

The errors in the conclusion of the charge, if any, were in favour of the defendants; because the jury were told that if the assured knew of the covering, they were not entitled to a verdict; whereas their knowledge of the fact ought not to be followed by any such result; they ought at least to have been parties to it.

*In reply* to the argument against the bill of exceptions, it was said that there were two questions. 1. Whether on the face of the bill a writ of error would lie. 2. Whether there was sufficient on the record to reverse the judgment. As to the *first*, a bill of exceptions lies to the whole charge, because it lies to each part separately. The word *decisive* does not

1810.

PHOENIX.
INS. CO.
*v.*
PRATT.

(a) 2 *Rob.* 89.

mean conclusive; but that the evidence was such as entitled us to a decision in our favour, and so the judge was asked to charge. If he had said that the evidence had weight, and so referred it to the jury, no exception could have been taken; but instead of that, the opinion of the court was given upon points of law, all of which we say are erroneous, when applied to the facts, and we have excepted to all. If the bill was too broadly taken, it should have been corrected below; it is now too late. As to the *second* question, that rests upon the argument already m de.

TILGHMAN C. J. delivered the court's opinion.

This cause was brought before us, by a writ of error to the Court of Common Pleas, founded on a bill of exceptions which states all the evidence, and contains the charge of the court at large. It was an action on a policy of insurance on goods shipped by *Pratt* and *Clarkson* on board the ship *Charles*, on a voyage from the *Havanna* to the *Danish* island of *St. Thomas* in the year 1805, when *Denmark* was a neutral power. The ship was owned by *Pratt* and *Clarkson;* and the captain and *Isaac Thomas* were joint agents of the plaintiffs, and supercargoes. The policy contained a warranty that the goods were *American* property, to be so proved here only, and it was fully proved that the goods were the property of the plaintiffs, who are *Americans*. Some evidence was given to prove, that captain *Stites* had taken in three hundred and fifty boxes of sugar, and twenty-seven bales of beeswax, which in truth were *Spanish* property, and carried them under false papers as his own property; but they were not blended with the goods of the plaintiffs. The invoice and other papers respecting them, were distinct from those of the plaintiffs. After the evidence was closed, the counsel for the defendants insisted that the several matters given in evidence, ought to be allowed as *decisive evidence* to entitle the defendants to a verdict. I think it would have been more proper, and would have brought the questions of law more to a point, if the counsel had proposed the particular matters on which they desired the opinion of the court to be given. Indeed it would have been impossible to give in charge to the jury, that the evidence was *decisive* on either side, without assuming the decision of facts, which is beyond

the power of the court. The judge viewing it in this light, did not say whether it was decisive or not, but summed up the evidence, and then gave his opinion on certain points of law, arising as he conceived out of the facts. The jury found for the plaintiffs; and the defendants' counsel excepted to the court's opinion, in general.

1810.

PHOENIX
INS. CO.
v.
PRATT.

It has been made a question how this bill of exceptions is to be understood, and what points are now open for discussion. If the president of the Court of Common Pleas had declared to the jury that the evidence was not *decisive* in favour of the defendants, I do not know that any objection could have been made to it. The evidence was legal, but how far decisive, the jury were to judge. It has been determined by this court in the case of *Burd* v. *The Lessee of Dansdale* (a) that if a judge gives an opinion upon *facts*, not warranted by the evidence, it is no error which can be assigned on a bill of exceptions. Neither do we conceive that advantage can be taken of an erroneous opinion on a point of law, immaterial to the issue which the jury are trying. But it is open to the plaintiff in error, to assign error in an opinion on any matter material to the issue, appearing on the bill of exceptions, although it is not particularized in stating the exceptions.

The judge's charge appears to be in substance, this, that the conduct of captain *Stites* in covering *Spanish* property (if he did cover it) without the knowledge of the plaintiffs, could not affect the goods of the plaintiffs, which were not blended with the covered goods; and therefore if the jury should be of opinion that the captain had on board *Spanish* property, and the plaintiffs *participated* in the act, their verdict should be given for the defendants; but if they should be of opinion that the plaintiffs had no *knowledge* of it, their verdict should be for the plaintiffs.

It is contended on the part of the defendants, that the plaintiffs are answerable for the conduct of their captain and agent, and his conduct has been such as to break the warranty of *American* property, or at any rate to increase the risk of the voyage, so that the plaintiffs ought not to recover. It is not unlawful for a neutral to carry the goods of a belligerent. So far from it, that it is the constant practice

(a) *Ante* 80.

of courts of admiralty to restore the ship with full freight to the neutral owner, unless the case is attended with particular circumstances. It was not the carrying of *Spanish* goods then, but the attempt to mask them under a neutral cover, that was a breach of neutrality. This attempt was the act of the captain, or perhaps of the captain and his colleague Mr. *Thomas.* It is therefore to be considered how far the act of one, or both of these persons, may be imputed to the plaintiffs. There are some principles about which there is no dispute. The captain is the agent of the owners with respect to the ship, and they must answer for his conduct. But he is not agent for the owners of the goods, unless so specially constituted. If he attempts to enter a port, in breach of a blockade, the ship is subject to condemnation, and so also is the cargo, although not committed to the care of the captain, if it belong to the owners of the ship. An agent for the owner of the goods, may likewise affect his principal, by his acts respecting the goods committed to his charge. If he violates the law of nations with respect to those goods, they may be condemned. So if he mixes or entangles them with goods which are contraband, or the property of an enemy, they must all share the same fate. This is the principle laid down by Sir *William Scott* in the case of the *Rosalie* and *Betty*, 2 *Rob.* 294. The same judge has decided that owners of the cargo, are affected by the conduct of their general agent or supercargo, not only civilly, but penally, to the amount of their property on board; *The Mars*, 6 *Rob.* 87; and this doctrine was adopted by this court in *Crousillat* v. *Ball*, of which my brother *Yeates* has a manuscript note, fuller than the report by Mr. *Dallas.* Taking the law to be so, the charge of the Court of Common Pleas seems to have drawn the attention of the jury to the wrong point; or at least to have laid them under too great restriction. The point submitted to their consideration, was, whether the captain covered *Spanish* property with the knowledge, or participation of the plaintiffs. The consequences resulting from improper conduct in a supercargo, or general agent, were thrown out of the question. Now suppose the jury had thought, that the captain, with the acquiescence of his colleague Mr. *Thomas*, had attempted to cover *Spanish* property without the knowledge of the plaintiffs; in that case the ver-

dict ought to have been for the defendants; and yet the jury under the charge of the court were bound to find for the plaintiffs. The Court of Common Pleas have laid down the law, that the goods of the plaintiffs could not be affected by any conduct of their agent, because they were not blended with the covered goods. In this we think they were wrong. The jury should have been told, that the whole property of the plaintiffs on board the ship, was liable to condemnation by the law of nations, if their general agents attempted to deceive one of the belligerent powers by covering the property of his enemy. We are therefore of opinion, that in this respect the charge was erroneous, and consequently the judgment must be reversed, and a *venire facias de novo* be awarded.

> Judgment reversed, and
> *Venire de novo.*