## Wheeler and West *versus* Winn.

1. A bill of exceptions under stat. 13 Edw. 1 is founded on some objection in point of law to the opinion of the court, as to the competency of witnesses, the admissibility of evidence or its legal effect, or some matter of law on facts not denied, in which either party is overruled by the court.

2. A bill of exceptions is not to draw the whole matter into examination again, it is only for a single point; the truth of it cannot be controverted after the bill is sealed.

3. If the exception be not stated in writing and tendered at the trial, it is waived; the party shall not resort to his exception after verdict against him; if to the charge it may be tendered at any time before the delivery of the verdict.

4. Error may be assigned on any point material to the issue appearing on the bill, although it was not particularized in stating the exceptions below.

5. Judges on return of a writ of error finding on the record palpable errors in a charge written or filed under the statute of 1806, are equally bound to take notice of them, as if in a bill of exceptions.

6. In either the modes—by the statute of Edward 1, or the filing the whole charge or points and answers filed under Pennsylvania statutes—the matter to be reviewed is brought *upon the record*, and the writ of error brings it into a court of error, where errors may be assigned to any part of the record, and it is the duty of the court to notice them.

7. The practice on a writ of error stated in this case.

8. Possession of an improvement used only to herd cattle, and abandoned every year when the pasture season ended, is not a possession for the purposes of the Statute of Limitations, although corners and lines were marked and cabins built upon it.

9. Possession of an improvement under the statute must be hostile, continued and exclusive, and also for purposes of residence or cultivation.

10. An annual entry on another man's land to cut timber, feed cattle, hunt or fish, with the cultivation of a truck patch in the summer, as incidental to the other pursuits, can never give title.

11. A claimant under such circumstances is a mere intruder, and cannot raise objections to a tax title under an assessment and sale by the treasurer, whose deed is conclusive against an intruder without color of title.

12. A treasurer's deed for unpaid taxes due more than a year before the sale, is not defective because a tax included in the sale had been assessed within a year.

13. The exemplification of a deed conveying land in two counties and recorded but in one, is evidence in ejectment for lands in the county in which it is not recorded.

ERROR to the Court of Common Pleas of *Mifflin county*.

[Wheeler *v.* Winn.]

This was an action of ejectment, commenced August 2d 1864, by John H. Wheeler and George S. West against John Winn, for 400 acres of land, which was surveyed in 1793, on a warrant to William Gray. The land was sold for taxes to R. C. Hale; the plaintiff showed assessments for 1820–23 and 1835, a treasurer's deed, June 12th 1838, to Hale, whose title vested in the plaintiff January 8th 1864.

The title of Gray, the warrantee, became vested in John Fries, who obtained a patent and devised the land to his two daughters, the wives of Robert Frazer and John Y. Clark, from whom the plaintiffs claimed title also, and offered in evidence exemplifications of two deeds, one from Clark and wife and the other from Joseph B. Conover. These deeds included lands in Philadelphia as well as the land in dispute; they were recorded in Philadelphia but not in Mifflin county; the evidence was rejected and exception taken. Other evidence, which was offered by the plaintiff and rejected, was deemed immaterial by the Supreme Court.

The defendant's claim was under the Statute of Limitations; he alleged that the possession commenced with an improvement of John Horning made in 1814, which he afterwards gave up to the defendant, who alleges that he has held possession ever since. The character of the possession is fully stated in the opinion of Woodward, C. J.

The plaintiffs submitted three points, the third of which only was denied. It was as follows:—

"The defendant has shown no such designation of boundaries or possession of the land claimed by the defendant, as to give him a title by adverse possession, under the Statute of Limitations, to any part of the land in dispute."

The court (Woods, P. J.), amongst other things, charged:—

"The plaintiffs have shown the assessment of this tract in 1823 in the records of the commissioners' office for this county, and also in 1835.

"If the sale was made on these assessments, it would be a compliance with the law, and would confer a good title on the purchaser. Had the plaintiffs stopped here, and offered no other evidence in relation to the assessment of these lands, and the treasurer's sale for taxes made thereon, it would be presumed that they had been made on the assessments so found in the commissioners' office. In order to show how this sale was really made, the plaintiffs themselves have called C. Ritz, the then treasurer, and D. Hough, the county surveyor, at or about that time. From the testimony of these witnesses, so called by the plaintiffs, the defendant contends that the sale was not made on the assessments of 1823 and 1835, given in evidence, but on an assessment made in January 1838, by the commissioners and Mr. Ritz, and entered in a book regularly, as spoken of by Mr. Ritz and Mr. Hough,

[Wheeler *v.* Winn.]

and which is now lost. You will remember what Mr. Ritz says about the assessment and sale, and also what Mr. Hough says about the list of unseated lands he made for the commissioners shortly before 1836, and also what he says about the book Mr. Ritz speaks of as containing the assessments of these unseated lands.

" We have thus read you all the testimony of these two witnesses on this point.—Does it satisfy you that the assessments on which this land was sold, were made by the commissioners with Mr. Ritz, and entered in the lost book as the assessments of unseated lands, after January 1838 ? If it does not, then it is to be presumed that the sale was made on assessment of 1823 and 1835, and would convey a good title to General Hale, and those claiming under him. But if it does, then one year did not elapse from the time of the assessment until the sale was made by the treasurer, and consequently the purchaser at such sale would take no title under it.

" How the fact is, you are to ascertain from the evidence before you."

The court charged also as to allegation of the defendant that the Horning improvement was kept up :—

" To sustain this allegation, he has shown that in or about 1814, one Michael Horning made an improvement, built a small house, cleared a few acres, and had a survey made of land in Licking valley. This house, some years after it was built, was burnt down, and another erected by the neighbors to herd cattle, and by the hunters. John Horning, the son and heir of Michael Horning, gave to Winn all the right he had to this Horning improvement. When a man claims title by adverse possession as against the real owner, he must show a continuous and uninterrupted possession in himself, or those under whom he claims, for a period of twenty-one years or more ; and in this case, before Winn could connect his possession with that of Horning, he would have to show to your satisfaction that Horning, or those claiming under him, kept up the possession of this land for twenty-one years.

" It would not vitiate his title by possession if he did not live on it all the time, if the house and improvements were kept up, and he only left it temporarily, with the intention of returning and possessing it, and actually did so within a reasonable time.

" Whether such a possession was kept up by Horning or those claiming under him, until near or about the time Winn went there, is for you to ascertain. If you find this in favor of Mr. Winn, the defendant, it would give him a good title for all the land contained within the lines of the Horning survey. If, however, you find that the Horning improvement had been abandoned or suffered to go down for some years before Winn went there, then he could not connect his possession with that of Horning, and the possession

[Wheeler *v.* Winn.

not being a continuous one, he could not avail himself of the Horning possession to make out his title."

Also as to the Statute of Limitations:—

"Has John Winn, himself, had twenty-one years' uninterrupted, peaceable and adverse possession of this land, before the bringing of this suit? You will remember that he first lived in a house on the opposite side of the creek from where he now resides. That he was there according to some of the witnesses, in 1844, and the improvements and house appeared as if they had been made and built for some years. And one witness speaks of his being there in 1842. If we believe the witnesses, he claimed up to lines which were marked on the ground, either the Horning survey or one he had made.

"The house where he first lived and the one he now lives in are on opposite sides of the creek, and are just about opposite each other, and according to some of the witnesses, the lines across this valley he claimed to own one above the houses and the other below them. When a man enters on a tract of land, under the color of title, has a survey made of the extent of his claim, has the lines marked on the ground, clears a part of the land, builds a house, lives on it, and exercises acts of ownership over the rest of the land by cutting timber, &c., and using it as his own, his possession would be co-extensive with the lines marked on the ground. If then, Winn went into possession of this land in 1842, and either claimed it by the survey of Horning or made one of his own, and claimed up to the lines of the survey marked on the ground, and remained in uninterrupted, peaceable and adverse possession for more than twenty-one years before the bringing of this suit; then, if the land in dispute lies within these boundaries, he would be entitled to retain it, and his title would be a good one against the world."

The plaintiffs took no exception to the charge, but requested the court "to reduce their entire charge to writing at the time of the delivery thereof to the jury, and to file the same of record forth with in this cause, according to the provisions of the late Act of Assembly in such case made and provided."

There was a verdict for the defendant. The plaintiffs took out a writ of error, and assigned for error the rejection of his evidence, the answer to his point, and the above stated parts of the charge.

*J. Alexander*, for plaintiffs in error, cited Dikeman *v.* Parrish, 6 Barr 210; Troutman *v.* May, 9 Casey 455; Foust *v.* Ross, 1 W. & S. 501; Shearer *v.* Woodburn, 10 Barr 512; Groft *v.* Weakland, 10 Casey 304; Dehaven *v.* Landell, 7 Id. 120.

[Wheeler *v.* Winn.]

*A. Reed,* for defendant in error, cited McKeen *v.* Delaney, 5 Cranch 22; Miller *v.* Hale, 2 Casey 432.

The opinion of the court was delivered, October 17th 1866, by

Woodward, C. J.—The material questions in this cause arise upon the assignments of error to the charge of the court below; but it is denied that the plaintiffs have a right to assign these errors, because they neglected to except to the charge. It appears from the record that both parties submitted points in writing to the judge, and the counsel for the plaintiffs signed and presented also a paper in the following words:

· " The court is respectfully requested to reduce their entire charge to writing at the time of the delivery thereof to the jury, and to file the same of record forthwith in this cause, according to the provisions of the Act of Assembly in such case made and provided."

The charge was accordingly written out and filed, but no exception in form was tendered or noted. The first question for us, therefore, is, whether an *entire* charge, so brought upon the record, is liable to assignments of error.

At common law, a writ of error might be had, either for an error apparent on the record, or for an error in fact, but it lay not for an error in law not appearing on the record; and of course, where the plaintiff or defendant alleged anything *ore tenus* which was overruled by the judge, this could not be assigned for error, as it did not appear on the record, and not being an error in fact, but in law, the party was remediless.

To remedy this evil, the stat. 13 Edw. 1, ch. xxxi., gave the bill of exceptions to any one that is impleaded before any of the justices, and who doth allege an exception, praying that the justices will allow it: Roberts's Digest of Statutes 92.

The terms of this statute, it will be observed, were very general; but a bill of exceptions under it has been described as founded on some objection in point of law to the opinion and direction of the court, either as to the competency of witnesses, the admissibility of evidence or the legal effect of it, or some matter of law arising upon facts not denied, in which either party is overruled by the court. If such bill be tendered, and the exceptions are truly stated in it, the judges ought to set their seal in testimony that such exceptions were taken at the trial; but if the bill contain matters false or untruly stated, or matters wherein the party was not overruled, the judges ought to refuse to affix their seals. A bill of exceptions is not to draw the whole matter into examination again; it is only for a single point, and the truth of it can never be controverted after the bill is sealed. The nature of the thing requires that the exception should be reduced to writing when taken and disallowed, like a special ver-

[Wheeler *v.* Winn.]

dict or a demurrer to evidence. It is not necessary, indeed, that the bill should be drawn up in form, but the substance must be reduced to writing while the thing is transacting. If the exception be not stated in writing, and tendered at the trial, it is waived, and the party shall not resort back to his exception after verdict against him. For perhaps if he had stood upon his exception, the other party need not have put the cause upon that point, but might have offered other testimony: Wright *v.* Sharp, 1 Salk. 288; 2 Tidd's Practice 788; Roberts's Dig. 94.

A bill of exceptions to the charge of the court may be tendered at any time before the jury have delivered their verdict in open court: Jones *v.* Insurance Co., 1 Binn. 38. A plaintiff in error may assign error in an opinion on any point material to the issue appearing on the bill of exceptions, although it was not particularized in stating the exceptions below: The Phœnix Ins. Co. *v.* Pratt, 2 Binn. 308. And it was said by Yeates, J., in Downing *v.* Baldwin, 1 S. & R. 304, that the statute 13 Edw. 1 gave the bill of exceptions in order that the points determined should be introduced into the record, and be decided on by a court of error.

So much for the English statute, which contemplates a bill of exception as the *only means* of bringing the points of law ruled by an inferior court upon the record for purposes of review in a court of error. But on the 24th February 1806, our legislature, without superseding the bill of exceptions, provided still another practice for bringing legal opinions upon the record. That act (see Purd. 807) provided that the judge who delivers the opinion of the court shall, if either party by himself or counsel requires it, " reduce the opinion so given with the reasons therefor to writing, and file the same *of record in the cause.*" That this act embraces charges delivered to juries as well as what are more technically called opinions, is shown by the case of Downing *v.* Baldwin, 1 S. & R. 300, which was, like the case before us, an instance of a charge filed at the request of counsel, but no exception taken to it, and the language of Chief Justice Tilghman in respect of it is worth quoting. "It has been strenuously argued," said the Chief Justice, " that this court can take no notice of the judge's charge, because it has not been brought on the record by a bill of exceptions. The Act of Assembly directs that in all cases in which the opinion of the court shall be delivered, if either party require it, it shall be the duty of the judges to reduce the opinion so given with the reasons therefor to writing, and *file the same of record in the cause.* The act does not say what shall be the consequence of this; it makes no mention of a writ of error or a bill of exceptions. But it is contended that it was not meant that any error in an opinion filed of record should be taken advantage of in any other manner than by a bill of exceptions. This construction has never yet been put on the act. The point,

[Wheeler *v.* Winn.]

indeed, has never been made, but has frequently been taken for granted both by court and counsel, that any error in an opinion filed of record may be taken advantage of on a writ of error without a bill of exceptions, and, upon full consideration, I am of opinion that the practice which has taken place is according to the true meaning of the Act of Assembly. The reason of introducing the bill of exceptions was, that the opinion excepted to could not otherwise appear upon the record. The statute does not say that a writ of error shall lie on the bill of exceptions. But, inasmuch as a writ of error lies at common law, and the effect of it is to bring the record before the superior court, the judges, finding the bill of exceptions upon the record, are bound to take notice of it." And to these very pertinent observations of Judge Tilghman, I may venture to add, that the judges, on return of a writ of error, finding upon the record palpable errors in a charge written and filed under the statute, are equally bound to take notice of them as if they were contained in a bill of exceptions. This conclusion results necessarily out of the language of the act, and of the judicial construction of it. In Bassler *v.* Niesly, 1 S. & R. 432, it was said by the same learned judge that in order to give the Act of Assembly its full effect, it would be the duty of the court, if required, to permit the necessary evidence to be placed on the record without a formal tender of a bill of exceptions : see also Munderbach *v.* Lutz, 14 S. & R. 126.

For fifty years the practice was regulated by these statutes—parts of charges specially excepted to being brought upon the record by bills of exceptions, and entire charges by request to file them under the Act of 1806—and errors assigned upon them because upon the record, whichever mode was adopted to bring them there.

But some judges were found who would dodge the propositions of law commonly called points, which counsel submitted, or if they noticed them in their charge, it would be in such equivocal language as to mean one thing in the jury-box and another thing in the court of error, or else, if they stated them clearly, they would delay to file the charge to the injury of parties, the Act of 1806 prescribing no time for filing it. To remedy these inconveniences the legislature passed the Act of 17th April 1856 (Purd. 164), which enacts that, " whenever the parties or either of them shall request the court to charge the jury on particular points of law, drawn up in writing and handed to the court before the close of the argument to the jury, the judge who charges the jury shall reduce the answers to the points to writing, and read them to the jury before they retire from the bar to consider of the verdict, and the said points and the answers thereto shall be filed immediately by the prothonotary, and become parts of the record of the case ;

[Wheeler *v.* Winn.]

and when exceptions are taken to the charge of the court in the manner now practised, it shall be the duty of the judge who delivers the charge to file the same in writing with the prothonotary, before the rising of the court, or within thirty days thereafter." Two things were provided for here—the bringing upon the record points and answers, and the filing of the whole charge or such parts of it as are excepted to within a specified time. Two days before this act another one was passed: see Pamph. L. for 1856, p. 337, requiring judges to file their whole charges of record when requested by parties or counsel. The old practice was not dispensed with but only added to, and now we have, 1st, the bill of exceptions given by the statute of Edward, where those parts of the charge which are excepted to are to be drawn out into a bill of exceptions sealed and filed of record; 2d, the whole charge filed under the Act of 1806, and the Act of 15th April 1856, within the time prescribed by the Act of 17th April 1856. It is the practice of some judges to add their signature or seal to the whole charge, but it is not necessary, for the signature sufficiently identifies it, and as it is not properly a bill of exceptions, but a statutory substitute for a bill, no seal is necessary, nor indeed proper. 3d, Points and answers written out and filed, is another statutory method of bringing the law of the case upon the record without a bill of exceptions.

And as in either of these modes the matter to be reviewed is brought *upon the record*, and the writ of error which goes to the whole record, brings it necessarily into the court of error, counsel may come here and assign errors upon any part of that record, and it is our duty to notice them. I have taken pains to state the practice more fully than was necessary to the case in hand, because it has fallen into some confusion, and it is no uncommon thing for us to hear debates about what part of the charge is upon the record and what is not. In this instance it is apparent that the whole charge is upon the record, for it was filed in pursuance of the written request of counsel, and was thus made a part of the record by the Act of 1806 and 15th April 1856, and the written points and answers are upon the record, for they are made parts of it by the Act of 17th April 1856. That no exception appears of record is immaterial.

The action was ejectment for a tract of land in Bratton township, Mifflin county, which was surveyed in 1793, upon a warrant to William Gray. The plaintiffs claimed title to it by virtue of a sale for taxes, and showed an assessment of taxes for the years 1820, 1823 and 1835, and a treasurer's deed to R. C. Hale, dated 12th June 1838. Hale's title vested in the plaintiffs in 1864, who instituted this suit 2d August 1864.

The defendant stood upon the Statute of Limitations, and to make out twenty-one years' adverse possession was obliged to rely

3 P. F. SMITH—9

[Wheeler *v.* Winn.]

upon an improvement commenced by John Horning in the year 1814, the right to which he claimed to have purchased. The court was called on by plaintiffs' 3d point to say that the defendant had shown no such designation of boundaries or continuance of possession as would make title under the statute, but the learned judge declined to affirm the point, and referred it to the jury to say whether Horning or those claiming under him kept up the possession until "near or about the time Winn went there." In looking through the evidence, we see no adequate proof of a possession by Horning to constitute title under the statute. Richeson Bratton, the first witness on the part of the defendant, says "Horning's improvement was made in 1814—that he built a small house for the purpose of having some one to live on it to herd his cattle. Michael Horning was put in there by his son John, and I was hired by John to go there to assist him. Michael Horning, when we went there, showed me the corners he claimed to up and down the creek. The corner was not far from the old path that ran across the mountain. The improvement was near the creek, six or eight rods from it. Old Mr. H. lived there, had a cow, churned butter, had beds, baked bread, &c. I stayed there through the summer season. I left old Mr. H. there. I do not think old Mr. H. stayed there through the winter. We sprouted and fenced up a piece, fenced a place for the cattle, and a piece of land for a truck patch. I do not know of his being there for any other purpose than to herd cattle through the summer. While I was at the Hornings they put cattle there every spring. The improvement was kept up from five to ten years. I think the fire burnt the house down. I do not know that the improvement was renewed after it was burned. Horning claimed 360 acres along the creek."

Another witness, Daniel Yoder, stated that "the hunters and fishermen kept up the house a good many years after it got old, for their accommodation and those who took cattle over there; after it was burned, a cabin was built there by the men who herded their cattle there, and the hunters. Horning had his cattle always over there. I don't know that he was there more than one summer, but they were there back and forward, and kept their cattle there. Horning lived at Horning's Ferry after he left the cabin. No one lived there but to watch their cattle after he left."

I have selected from the strongest evidence on the part of the defence this description of the Horning improvement, for the purpose of showing that it lacked continuity, without which it never could ripen into title. No matter what corners and lines were marked or cabins built, if the possession was used only to herd cattle, and abandoned every year when the pasture season ended, it was not a possession for the purposes of the statute. And such as it was, it seems to have been a mixed possession with hunters, fishermen and other herdsmen, and not exclusive in the Hornings.

[Wheeler *v.* Winn.]

It was not, therefore, such a possession as could confer title, for it is a well-settled principle of construction, that a possession under the statute must be not only hostile, but continued and exclusive. And it must be also for purposes of residence or cultivation. An annual entry upon another man's lands, to cut timber, to feed cattle, to hunt or fish, can never give title, and the cultivation of a truck-patch during the summer as incidental to the other pursuits, does not redeem such entries from the character of occasional trespasses.

We are of opinion that the evidence failed utterly to show such an improvement, commenced and continued for twenty-one years before suit brought, as could constitute title under the statute, and that the court erred in submitting it to the jury as evidence of title in Winn. The consequence of this ruling is, that Winn is to be regarded as a mere intruder, and therefore not in position to raise objections to the tax title of the plaintiffs: Foster *v.* McDivitt, 9 Watts 341; Foust *v.* Ross, 1 W. & S. 501; Dikeman *v.* Parrish, 6 Barr 210; Troutman *v.* May, 9 Casey 462. The treasurer's deed to Hale has not been exhibited to us, but if it was made, as we suppose, for the unpaid taxes before mentioned, it was not defective by reason of a tax included in the sale that was assessed within a year of the sale. Where an assessment of taxes is shown, and a treasurer's sale is made for their collection, the deed is conclusive against an intruder without title or color of title.

We think the court also erred in rejecting the exemplifications of the deeds offered on the part of the plaintiffs, for it was decided in Leazure *v.* Helligas, 7 S. & R. 313, that the office copy of a deed conveying lands in two counties and recorded in one only, is evidence in ejectment for lands in the county in which it is not recorded.

We see no importance in the remaining bills of exception.

The judgment is reversed, and a *venire facias de novo* is awarded.